## THE OTTAWA.

### DUNHAM TOWING & WRECKING CO. *v.* THE OTTAWA.

*(District Court, N. D. Illinois.   December 5, 1887.)*

SHIPPING—CHARTER-PARTY—LAY DAYS—STRESS OF WEATHER.
    The respondent had chartered a tug of libelant agreeing to pay $125 per
day for it while wind-bound.  The tug was discharged at Grand Haven.  From
that day, December 7th, she remained in Grand Haven until December 10th;
the captain being informed a storm was coming by the signal-service officer.
Other steamers ran in and out of Grand Haven until the 11th, and the storm
did not come until the 8th, and there was ample time for the tug to have re-
turned to Chicago before it.   *Held*, that as there was no storm prevailing on
the 7th, and no indications of an immediate storm, respondent was not liable
for the lay-days.

In Admiralty.

Libel by the Dunham Towing & Wrecking Company against the
schooner Ottawa, respondent, for the services of a tug while detained in
port by stress of weather.

*Schuyler & Kremer*, for libelant.

*Geo. A. Farr*, for respondent.

BLODGETT, J.   This is a libel for the services of the tug Morford, at the
rate of $125 per day, during the time she was, as alleged by libelant, de-
tained in the port of Grand Haven by stress of weather.   The case made
by the pleadings and proof is substantially this:   On the first of Decem-
ber, 1885, Buswell & Co., residents of Grand Haven, made a contract of
charter with the Dunham Towing & Wrecking Company for the services of
the tug Morford to tow the schooner Ottawa from the port of Chicago to
Grand Haven, and from there to Cheboygan, Michigan, at the price of
$200 a day while engaged in towing, and $125 a day while wind-bound
in port, the employment to date from 6 o'clock in the evening of the
first day of December.   There was some delay in getting out of the port,
so they did not leave the port of Chicago until some time in the evening
of the second of December, the day after the contract commenced.   On
leaving the harbor they laid their course for Grand Haven; but, as the
captain of the tug testifies, after being out two or three hours, they en-
countered a heavy sea from the northward, when they drew in towards
the west shore of the lake, and kept near the shore until they reached
Milwaukee, about 2 o'clock in the afternoon of the 3d, where they laid
until about 4 o'clock in the morning, when, the sea running down, they
left Milwaukee and ran across to Grand Haven, reaching there on the
afternoon of the 4th.   They lay in Grand Haven until Monday morn-
ing, the 7th, when for reasons which are not disclosed by the testimony,
and not necessary to consider, Buswell & Co. notified the tug that they
had no further use for her, having abandoned the idea of getting the Ot-
tawa to Cheboygan, and that the tug could return to Chicago.   The tug
did not return to Chicago until the ensuing Friday, having left on Thurs-

day afternoon, and returned by way of Milwaukee, instead of steering directly for Chicago, and it is claimed that the detention from Monday until Thursday was by reason of bad weather, which prevented the tug from making the trip from Grand Haven to Chicago at an earlier date, and, under the wind-bound clause of the charter, this claim is made and insisted upon.

The proofs show, on the part of libelant, that on Monday morning, when the captain was notified that the services of the tug were no longer required, the captain of the tug visited the signal-service office in Grand Haven, and was there told that a storm was coming; and that several propellers and barges were then lying in Grand Haven harbor, having taken refuge there, and did not deem it prudent to leave until about the time the tug left, and that the weather was so cold as to endanger the tug by the accumulation of ice upon her bows and over her decks. The proof on the part of the respondent shows that the weather on Monday, at the time the tug was discharged, was not threatening, and the water not rough enough to make navigation at all perilous to a strong, well-equipped tug like the Morford, and did not become so until about noon on Tuesday; that the captain, on visiting the signal-service office, was not told that a storm was coming immediately, but that there was a storm coming that way, and that it might reach there within 10 hours. The proof also shows that the steamers plying on the regular line between Grand Haven and Milwaukee made their regular trips every day, from Monday until Thursday and Friday, without any detention by reason of stress of weather, and that two schooners arrived in Grand Haven harbor during Tuesday, making the trip by sail direct from Chicago, and that none of these craft experienced any trouble from the sea, nor from the formation of ice.

I think the testimony may be taken as conceding that, if the same kind of weather had prevailed on Monday that prevailed from Tuesday noon to Thursday, it might have been prudent for the tug to have remained inside the harbor; but I think the proof leaves the case in precisely this condition: The weather was pleasant, and not so threatening in its external indications as to make it probable that a severe storm was near at hand at the time the tug was discharged. The tug could have left Grand Haven by 11 o'clock Monday morning. It is probably true that the sergeant in charge of the signal office told the captain of the tug that there was a storm coming, but there was no storm signal displayed, and he had not been ordered at that time to display one, and no storm did occur until time enough had elapsed for the tug to have made the entire trip from Grand Haven to Chicago.

Now, then, we have just simply this case presented: This captain, learning from the signal-service office that a storm might come,—and an experienced navigator on these lakes need not have consulted a signal-service officer in the month of December to learn that,—saw fit to remain in port, and wait until he could have smooth water and warm weather for his home run. There were no portents in the weather itself foretelling a severe storm, and other navigators whose duty required them to

put to sea did so, and made their voyages in safety. I do not think the signal-service officers have become so thoroughly versed as yet in the laws governing the changes of the weather as to make their predictions a safe guide by which to regulate the movement of the vessels engaged in commerce. We know from our common experience and observation that their predictions fail at least as often as they are realized, and that they would make a very unreliable criterion for navigators to adjust their times of going to and from their ports by,—so much so as to make it impracticable to allow their predictions very materially to control the movement of ships without regard to the trained judgment of experienced seamen, especially when voyages are short as they are upon our lakes, and vessels never very far from a port of refuge. But, even if their predictions were implicitly reliable, the proof shows that the signal officer only told the captain that his information was there was a storm impending, which might reach there in 10 hours, and there was then ample time for this strong, swift tug to have made this port, without the incumbrance of a tow, before the arrival of the predicted storm; so that it seems to me no excuse is shown for this delay in port from Monday till Thursday.

It is urged that the question whether the weather is such as to make it dangerous or bad seamanship to leave a safe harbor by reason of bad weather, that is, whether a vessel is wind-bound, is wholly a matter of judgment and discretion on the part of the master, and that, if he deems the weather so rough or threatening as to make it unsafe to leave port, then all parties are bound by his action in that regard. I think this is a fair statement of the general rule, if there can be said to be a general rule, on the subject, but this rule as stated is, I think, subject to this qualification: that the weather must be actually tempestuous or rough, or there must be such indications of a coming tempest as are considered reliable by experienced navigators in those waters; and I am satisfied from the proof that there was no such storm prevailing, and no such indications of an immediate storm on Monday morning, when the tug was discharged, as should have kept a prudent seaman in port. If the captain of the Morford had left Grand Haven, say, at 11 A. M. on Monday morning, he could have made the port of Chicago before any bad weather would have been experienced. It must be borne in mind that this was in the winter-time, when rough weather was to be expected. This captain had no right to lay in port, at the expense of another, waiting for a summer sea. He must have known that at that time of year rough weather and water were the rule, and the mere fact that the weather was cold and some sea running was no more than was to be anticipated; but I do not think, from the proof, that the weather was either such in fact, or to be anticipated from threatening indications, as to make it seem perilous to a properly prudent and courageous seaman.

I do not intend to be understood as saying that the weather prognostications of the signal-service bureau are to be wholly disregarded by the prudent seaman, but that they are not to be implicitly followed; and also to say, in this particular case, that no such indications or informa-

tion were obtained from the signal officer as justified the master of this tug in remaining in port during the day he was discharged.

The only controversy in this case is as to the amount of these lay-days in the harbor of Grand Haven. I shall therefore dismiss the libel, as libelants have been paid for all the remaining time, and for time enough to have made the trip from Grand Haven to Chicago if they had started on Monday morning.